## STILLMAN *v.* STILLMAN.

1. DIVORCE AND ALIMONY. The amount of alimony to be allowed is a matter for the discretion of the court, in view of the particular circumstances of each case. The fact that the wife had been the owner of a large portion of the property out of which alimony is to be allowed, always constitutes a ground for making the allowance liberal, and under some circumstances of special fault on the part of the husband, and peculiar merit on the part of the wife, will justify the giving to her the entire estate that came by her. In general, it is not usual to allow the wife more than one-half of the husband's estate, after making proper deduction for his indebtedness existing before the divorce.

2. ESTOPPEL. *Evidence.* It is manifest that complainants Julia E. and

Sarah are estopped from setting up claim to the property in opposition to their sworn statements in their depositions in 1866.

Case cited: Cooley *v.* Steele, 2 Head, 605.

### FROM SHELBY.

Appeal from the Chancery Court.  R. J. MORGAN, Chancellor.

JNO. G. FINNEY for complainant.

ROBERTSON and CARUTHERS for defendant.

NICHOLSON, C. J., delivered the opinion of the court.

On the 12th of June, 1865, Eliza Stillman filed her bill in the Chancery Court at Memphis against her husband, C. A. Stillman, charging him with adultery, and praying for a divorce and alimony.  She also alleged that soon after this marriage in New Orleans in 1848, she put into a dry goods and fancy store $6,000, on which she and her husband did business until 1853, when she was driven from her home by his cruel conduct, and his association with a woman of easy virtue, and that in 1854 he clandestinely removed from New Orleans, carrying with him the entire stock of goods, etc., amounting to about $15,000, and settled in Memphis.  She charges that he had accumulated a large estate, but by various fraudulent devices he kept his property in the names of his brothers, although he was the real owner.  She specifies several valuable houses and lots in Memphis as his property, and prays for injunction and attachment.

She prays for a divorce, and for alimony out of his property, and for general relief.

An injunction was granted and issued, but no attachment.

The only party defendant to this bill was her husband, C. A. Stillman. He answered, admitting the marriage, but denying all the other allegations of the bill, and charging complainant with adultery both before and after this marriage.

Upon the hearing of the case, at the request of the parties, the Chancellor submitted to a jury various issues of fact tendered by the parties, on which the jury rendered their verdict to the effect that defendant had been guilty of adultery, and that he brought from New Orleans to Memphis a valuable stock of goods belonging to complainant, and that complainant had not been guilty as charged by defendant.

Upon the proof, and in the verdict of the jury, the Chancellor decreed that complainant was entitled to a divorce and to alimony, and referred the question as to the amount of alimony to be allowed to the clerk and master for proof and report.

Defendant appealed from this decree to the Supreme Court, and at its April Term, 1869, defendant dismissed his appeal, thus leaving the decree below in force, and to be executed by further proceedings.

On the 3d of February, 1871, Chancellor Morgan rendered a decree in the cause, in which he held that "complainant is entitled to have set apart to her as permanent alimony, the following property, to-wit: so much of the leasehold estate heretofore, to-wit, on

the 5th day of July, 1853, leased by Wm. Yates to R. B. Hawley and Hezekiah Hawley for fifty years, said lease ending on the 5th day of July, 1903, situated on the Southeast corner of Poplar and Fourth streets, in Memphis, Tenn., as is covered by storehouses Nos. 137, 139 and 141 on Poplar street, and dwelling houses Nos. 100 and 102 on Fourth street, and all the ground embraced in said lease lying between said houses on Poplar street and Fourth street, and numbered as aforesaid, together with said houses or tenements on Poplar and Fourth streets, numbered as aforesaid, and everything to them appertaining, the court being of opinion, and so decreeing, that said houses and the ground on which they are built for the term of the lease aforesaid, belongs to said C. A. Stillman."

The Chancellor further decreed "that permanent alimony for complainant should begin from the date of the sentence or decree of divorce in the cause, and therefore that complainant is entitled to the rents and profits of the property herein set apart to her from that date, which date is fixed by reference to the decree of the Supreme Court on the 1st day of July, 1869," etc.

From this decree complainant appealed to this court on the 14th of March, 1871.

It appears that during the progress of the cause, to-wit, on the 21st of February, 1868, complainant applied by petition for the appointment of a receiver to take possession of and rent out the property described in the petition, to-wit, the block of brick buildings on the North side of Munroe street in Mem-

phis, between Third and Fourth streets, known as the Stillman block, and the block of brick buildings on the corner of Fourth and Poplar streets, Memphis, etc.

The Chancellor granted the petition, and appointed the clerk and master receiver. This order was made on the 21st of February, 1868.

When the receiver proceeded to execute the order as to renting out the property, to-wit, on the 28th of February, 1868, Julia E. Stillman, Christian Sprigil, and his wife Sarah, formerly Sarah Stillman, and Marion Stillman, administratrix of Lee Stillman, deceased, filed their bill in the Chancery Court at Memphis against C. A. Stillman and Eliza Stillman, in which they deny that the property placed in the hands of the receiver was in fact the property of C. A. Stillman; but they allege that the same belonged entirely to them, and therefore was not subject to be appropriated for the permanent alimony of Eliza Stillman. They allege that they had acquired title to the property several years before the order appointing the receiver, and that they had been in possession by their tenants, receiving the rents and profits, and that not having been parties to the suit, in which the order appointing the receiver was made, they were not precluded from sooner setting up their title. They claim the property on the North side of Munroe street by virtue of a lease thereof, made by John Overton to T. K. Stillman on the 11th of March, 1862, and by T. K. Stillman assigned on the 1st of January, 1863, to Lee Stillman, the intestate of complainant Marion, and the former partner of complainants Julia E. and

Sarah, and that the transfer was made to Lee Still-man for the benefit of the firm, the property having been purchased and improved with the money of the firm.

They claim the property on Poplar and Fourth streets by means of a lease thereof, assigned to Lee Stillman by R. B. Hawley on the 19th of April, 1864. This assignment also to Lee Stillman is alleged for the benefit of the firm.

Eliza Stillman answered this bill, denying that Julia E., Sarah and Lee Stillman were ever partners in trade in Memphis, but charging that all the capital, property and assets of said partnership belonged to defendant C. A. Stillman, who was using the name of his brothers and sisters to cover up and conceal his property and to defraud defendant Eliza, who was then his wife, and to prevent her from asserting any claim to said property. She repeats the charges in her bill for divorce and alimony, as to the receipt by C. A. Stillman of $6,000 of her money, their vesting it in trade in New Orleans, his clandestinely removing the money and goods to Memphis, and the fraudulent devices by which he had covered up his property in the names of his brothers and sisters to avoid her claim to alimony.

This cause was heard by Chancellor Morgan on the 23d of December, 1870, and being of opinion that complainants had no title to the property in contro-versy, but that the same belonged to C. A. Stillman, this bill was dismissed. From this decree complain-ants have appealed to this court.

The first question for determination is, to whom did the property claimed by complainants belong? If it belonged to complainants, then the Chancellor erred in decreeing permanent alimony in it to Eliza Stillman in the divorce case.

In their bill complainants claim that the property was purchased with means derived from the partnership in the fancy goods and millinary business carried on by Sarah, Julia E. and Lee Stillman, under the firm name of Stillman & Co. Sarah and Julia E. were examined as witnesses in the divorce suit, and were interrogated specially as to the persons who composed the firm of Stillman & Co., and they both stated that Lee Stillman was not a member, but that he was one of their clerks, on a salary of about $1,500 a year.

This testimony was given about two years before complainants filed their bill setting up claim to the property, and in their depositions they make no such claim, although in the divorce suit Eliza Stillman was seeking alimony in this same property as belonging to C. A. Stillman.

It is manifest that complainants Julia E. and Sarah are estopped from setting up claim to the property in opposition to their sworn statements in their depositions in 1866. *Cooley* v. *Steele*, 2 Head, 605. If this obstacle was out of their way, they have failed to show that the leases in question were paid for out of the assets of the firm of Stillman & Co., of which they claimed, in their depositions to be the only members.

But if Julia E. and Sarah are estopped from claiming title to the property in controversy, upon the ground stated in the bill and upon the proof, on what ground can Marion Stillman, as administratrix of Lee Stillman, set up her claim? These leases were personal property, and therefore subject to return as such in the inventory of the personal estate of Lee Stillman.

C. A. Stillman was his administrator, and Marion Stillman his administratrix. They gave bond in $20,-000, whereas these leases are shown to have been worth double this amount. In returning this inventory they fail to include these leases as part of the intestate's personal estate.

After the present bill was filed, complainant Marion made her settlement as administratrix, and makes oath to the correctness of the same, and yet these leases are not included.

If it be conceded that these omissions to recognize and treat the leases as the property of Lee Stillman's estate by his representatives may have occurred from ignorance of their duties in this respect, and therefore not conclusive by way of estoppel, the question recurs, were these leases in fact the property of Lee Stillman?

The allegation of the bill is, that the leases were bought and improved with partnership means.

It is shown that the first firm formed after the arrival of C. A. and Lee Stillman from New Orleans in 1855, consisted of the two brothers, under the style of L. Stillman & Bro. According to the proof this firm operated on the stock of goods brought by C.

A. Stillman from New Orleans, but it continued only a few months, when it was sold out to Beekman & Campbell, of New York, in payment of a debt of about $3,000, due to that firm. Soon afterwards the goods were conveyed by Beekman & Campbell to N. F. Stillman and complainants Julia E. and Sarah Stillman, the first named being a brother living in New York, and the other two his sisters, just from school. After this firm was carried on under the style of N. F. Stillman & Co. for some time, N. F. Stillman's name was withdrawn, and then the firm was Stillman & Co. It does not appear that Lee Stillman was connected with either of the firms after the sale to Beekman & Campbell in 1855, except as a clerk on a salary.

It is true, however, that according to the testimony of C. A. Stillman, Beekman & Hodges, Lee Stillman was still connected with the several successive firms, although his name did not appear as a partner. Opposed to this evidence is that of Julia E. and Sarah Stillman, admitted members of the firms, who prove that Lee Stillman was not a partner, but only a clerk. It is impossible to suppose that these two witnesses could be mistaken as to the fact, whether Lee Stillman was their partner or not. Beekman & Hodges were merchants in New York, and derived their impressions from the representations of C. A. and Lee Stillman, and as to them Lee Stillman may have been a partner, when, in fact, as between himself and his two sisters, he was no partner. As to the testimony of C. A. Stillman we are forced by his course of

swearing as developed in the record, to attach no weight to it, opposed as it is to the evidence of Julia E. and Sarah. We are therefore of opinion that the decided weight of the proof is that Lee Stillman was not a partner of complainants, Julia E. and Sarah Stillman.

It follows, that if Lee Stillman was the real owner of the property in controversy, he derived his title upon other consideration than that of means derived from the partnership of Stillman & Co. as a member of that firm.

Notwithstanding the bill alleges that the leases were bought from the assets of the firm, and effort was made to show that Lee Stillman obtained means from his father-in-law, for the purpose of paying for the property.

Besides being contradictory of the allegation in the bill, this evidence consists of declarations made by Lee Stillman to a witness in the absence of the other parties in interest, and it stands unsupported by other evidence, which, under the circumstances, was essential to sustain it even if it was competent testimony.

The claim of Lee Stillman, therefore, rests upon the single fact, that one of the leases was assigned to him by Overton, and the others by his brother, T. K. Stillman. It appears by the evidence of Hawley that he sold the lease for the property on Poplar and Fourth streets to C. A. Stillman, and that the two brothers, C. A. and Lee Stillman, were present when the money was paid, but that he was required to convey the lease to Lee Stillman. This lease, although

not to expire until the year 1903, was never regis-
tered. No explanation is given of the fact that Haw-
ley was required to convey the lease to Lee Still-
man.

But besides these suspicious circumstances, it ap-
pears that in Janurry, 1865, Lee Stillman conveyed
the lease to James Wells, a brother-in-law, and that
when the present bill was filed the title of the lease
was not in Lee Stillman's representative, but in James
Wells, and it so remained until a year after this bill
was filed, when Wells re-conveyed to the representa-
tives of Lee Stillman.

Under all these circumstances we are forced to the
conclusion that the lease was bought and paid for by
C. A. Stillman, and that the conveyance was first
made to Lee Stillman, and then conveyed by him to
Wells, and after this suit brought re-conveyed to Lee
Stillman's representatives; that these were all fraudu-
lent devices to cover up the property.

As to the lease for the Monroe street property from
Overton, it appears that C. A. Stillman made the con-
tract and paid the money, but the conveyance was re-
quired to be made to T. K. Stillman, a brother of
C. A. Stillman, who lived in Mississippi, and was not
present, and, as far as we can see, knew nothing of
and had nothing to do with the transaction. Some
months afterwards T. K. Stillman assigned the lease to
Lee Stillman, but upon what consideration does not ap-
pear. If the lease was procured by C. A. Stillman
for Lee Stillman, and with his means, no reason is
given why the conveyance is not made directly to him,

instead of first to T. K. Stillman, who lived in another State, and then by him to Lee Stillman. The inference is irresistable that the lease was bought and paid for by. C. A. Stillman, but to cover it up, was first required to be conveyed to T. K. Stillman, and afterwards by him to Lee Stillman.

Whether either of the leases was paid for, or the improvements therein made with the money derived from the business of Stillman & Co., as alleged in the bill, is not made to appear, and, therefore, we are forced to conclude, as did the Chancellor, that the proof fails to sustain the allegations of the bill.

It is impossible ever to unravel and disentangle the transactions of these brothers and sisters, involving several partnerships, composed of different members of the family, so as to ascertain and declare the relative rights and interests of the parties. It is sufficiently apparent that C. A. Stillman was the controlling member of the family, and that he was the master spirit in planning and executing the various transactions, which resulted in the accumulation of a large amount of property. In consequence of the unfortunate relation existing between him and his wife, it is easy to see that he had a strong motive to cover up his property, so as to be beyond the reach of the claim of his wife, either for any means of hers he may have used, or for permanent alimony. This motive furnishes a satisfactory explanation of his repeated efforts to procure a divorce, and also of his unsuccessful effort to fix upon his wife the charge of adultery when she commenced proceedings for divorce and almony.

Assuming that he had absconded from New Orleans with a valuable stock of goods, in which his wife was largely interested—and such was the verdict of the jury—and that he had been guilty of adultery, for which his wife was entitled to a divorce—and such, too, was the verdict of the jury—we have no difficulty in discerning the motive which induced him to go to Chicago, Illinois, and there, by the aid of his brother Lee and his sisters Sarah and Julia E. as witnesses, procure a divorce from his wife; and the same motive furnishes an explanation of the singular fact, that after divesting himself of all title to the stock of goods brought from New Orleans by an absolute sale to Beekman & Campbell, his name ceased from that time forward to be known as a member of either of the several firms afterwards found in the names of his brothers and sisters, although it is apparent that he was actively engaged in arranging and managing these several partnerships.

It is made satisfactorily to appear that C. A. Stillman was the only member of the family connected with the transactions detailed in the record who had any means with which to carry on the business of the several firms.

By the verdict of the jury, C. A. Stillman brought from New Orleans a stock of goods valued by the witnesses at from $15,000 to $20,000. After a sale of these goods to Beekman & Campbell, of New York, which was manifestly fraudulent, the goods passed into the hands of his brother, N. F. Stillman, and his two sisters, Sarah and Julia E., all of whom were minors,

and one of whom, N. F. Stillman, continued to reside in New York, and was only a nominal partner. The two minor sisters, just from school, came out from New York and carried on the business of selling fancy goods and millinery, under the management, advice, and superintendence of C. A. Stillman, the elder brother, and the original owner of the first stock of goods. Afterwards, the name of N. F. Stillman was dropped, and the firm was Stillman and Co., the two brothers, C. A. and Lee Stillman, managing and superintending as salaried clerks. That the two sisters performed valuable services, and contributed largely to the successful prosecution of the business, is apparent, but that the business yielded the immense profits sufficient for the purchase and improvement of the various leases set out in the record, and that C. A. Stillman, the only capitalist of the family, had no interest in the business or its profits, is not supported by the proof.

Viewed in the light of the motive which C. A. Stillman had to conceal his interest in the business, we think the proof shows that he was the real owner of the property of the firms, and that his brothers and sisters permitted themselves to be used by him as the ostensible parties owning the goods, to enable him to avoid the claims of his wife.

What were the real terms on which his brothers and sisters conducted the business the proof does not disclose, nor can we examine into this view of the case, since they have elected to base their claim entirely upon the allegation that their brother, C. A.

Stillman, had no interest whatever in the business of the partnership.

The business transactions of C. A. Stillman, in reference to the two leases in controversy, as well as his repeated admissions and declarations of ownership, which are already proven, at a time when he may have supposed that he was protected by the decree of divorce at Chicago, leave no doubt on our minds as to the correctness of the decree of the Chancellor in holding the property to be that of C. A. Stillman, and in dismissing the bill of complainants.

The remaining question is, whether the Chancellor erred in his decree as to the permanent alimony assigned to complainant in the case of Eliza Stillman against C. A. Stillman.

The amount to be allowed for alimony is a matter for the discretion of the Chancellor, in view of the particular circumstances of each case. Of course, no fixed rule can be laid down by which every case is to be governed. The fact that the wife had been the owner of a large portion of the property out of which alimony is to be allowed, always constitutes a ground for making the allowance liberal, and under some circumstances of special fault on the part of the husband, and peculiar merit on the part of the wife, will justify the giving to her the entire estate that came by her. In general, however, it is not usual to allow the wife more than one-half of the husband's estate, after making proper deduction for his indebtedness existing before the divorce; but, as before re-

marked, each case must be governed by its own circumstances.

In estimating the permanent alimony to be decreed to complainant in the present case, it is proper to take into consideration the following facts and circumstances: When the parties commenced the fancy goods and millinery business in 1848, in New Orleans, complainant put into the concern $6,000, which was increased to $15,000 in 1854, when she was forced, by the adulterous conduct of defendant, to abandon him. Soon afterwards defendant made an unsuccessful effort to procure a judicial order of separation, and failing in this, he removed clandestinely to Memphis, Tenn., carrying with him the entire stock of goods, estimated to be worth about $15,000. In this stock of goods complainant had an interest, including the $6,000, amounting to about $10,000, if there were no unpaid debts. Upon this capital defendant commenced business in Memphis, in 1855 or 1856, but soon managed to withdraw his own name from the business, and by successive changes of firms, using the names of his brothers and sisters in constituting the different firms, and in this way having the business carried on in a way to cover up and conceal his own connection with and interest in its profits.

It appears that in carrying out his device he procured the active co-operation and services of his two minor sisters, Sarah and Julia E., and his brother, Lee Stillman. It is shown that the success which followed in the business was owing, in a material degree, to the industry and skill of his two sisters.

While it is made to appear that the business in fancy goods and millinery was prosperous and profitable, it does not appear what amount was furnished from this business towards the various purchases of real and leasehold property made by defendant, and which resulted in the accumulation of a large estate, including the property involved in this controversy.

It appears that after commencing business in Memphis, defendant made one, and, perhaps, two unsuccessful efforts in that city to ·procure decrees of divorce before he finally succeeded, by the aid of his two sisters and his brother Lee, as witnesses, in procuring a void decree in the courts of Illinois.

It further appears, that when complainant commenced her suit for divorce and alimony, upon the ground ol adultery and abandonment, defendant sought to defeat her suit by charging · adultery upon complainant, and to sustain this , charge procured witnesses to swear falsely in support of his unfounded charges.

It appears that in 1865, when complainant filed her bill for divorce and alimony, defendant claimed to be the owner of real and leasehold estate of the value of $100,000, but a large portion thereof was held in the name of others, and most of that in his own name was unimproved property, held by unregistered titles, and when the receiver was appointed, in 1866, he had disposed of most of his property, except that taken possession of by the receiver, and which was improved and productive property.

It appears that the property in the hands of the receiver, out of which alimony was claimed, consisted

of four dwellings on Monroe street, valued by one of the receivers at $10,000 cash; four dwellings on Fourth street, valued at $15,000, and five store-houses on Poplar street, valued at $20,000. The houses on Monroe street were built on ground the lease of which has expired; the buildings on Fourth and Poplar streets on ground leased for about thirty years.

In view of these facts and circumstances the Chancellor, in the exercise of the discretion vested in him, was of opinion that justice would be done to all the parties in interest by decreeing to complainant for permanent alimony so much of the property situated on the south-east corner of Poplar and Fourth streets as is covered by store-houses Nos. 137, 139 and 141 on Poplar street, and dwelling-houses Nos. 100 and 102 on Fourth street, estimated to be of the value of $20,000.

In coming to this conclusion it is manifest that the Chancellor had regard to the interests of the brothers and sisters of defendant, who had contributed by their labor and services in the acquisition of the property, as well as to the claims of creditors of defendant.

We are satisfied with his conclusion, except that the reasonable costs of complainant in procuring her rights by the aid of solicitors should be included in the costs of the cause, to be a lien upon the property in the hands of the receiver not allotted to complainant as part of her permanent alimony. With this modification we are satisfied with the decree of the Chancellor, and affirm it, with the costs of this court to be paid

by defendant, and to be a lien on the property as provided for the costs below.

The cause is remanded for such further proceedings as may be necessary.

The decree in the case of Julia E. Stillman, etc., *v.* Eliza Stillman, etc., is also affirmed, with costs against the appellants.

———

In the attitude in which these cases are presented in the record, we have not felt that it would be proper to determine any question except that A. C. Stillman was the owner of the property impounded, so far as Eliza Stillman's claim for alimony was involved : but as to any question between the creditors of A. C. Stillman and his sisters, and the widow and children of Lee Stillman in regard to the title to property, we have given no opinion, that question not being involved in the issue in the case. The decree already entered conforms to this holding of the opinion, and will so remain, without the amendments suggested.

We can make no order or decree in regard to the rights of McKinney, Bryson & Co., who claim to be judgment creditors of A. C. Stillman, for the reason that no decree was made by the Chancellor on this question, and they have not brought the case here by appeal or writ of error. Of course, in this state of the case, this court could do no more than to declare the rights of Eliza Stillman in the property impounded, and to leave the creditors of A. C. Stillman to their remedies by such proceedings as they might resort to

in the enforcement of their rights, whether as against Eliza Stillman, or as against the sisters of A. C. Stillman and the widow and children of his brother, Lee Stillman.

The application, therefore, for the order or decree indicated is disallowed.